UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

FILED

NOV 15 2018

US DISTRICT COURT
NEW ALBANY DIVISION

TANNERS CREEK DEVELOPMENT, LLC,
ENVIROANALYTICS GROUP, LLC,
INDUSTRIAL DEMOLITION, LLC, and
COMMERCIAL DEVELOPMENT
CO., INC.,

                    PLAINTIFFS,

v.

ARTHUR M. TOMS,
DORI B. SCHWEITZER,
JAMES B. TOMS, III,
ANDIS, LLC,
ATRC, LLC,
STANCO EQUIPMENT CO., INC., and
SANDOR ENTERPRISES, LLC,

                    DEFENDANTS.

4 : 18-cv- 0 2 1 1 SEB -DML

CASE NO. _____

---

### VERIFIED COMPLAINT

Plaintiffs, Tanners Creek Development, LLC, EnviroAnalytics Group, LLC, Industrial Demolition, LLC, and Commercial Development Co., Inc. (collectively "Plaintiffs"), by counsel, for their Complaint against Defendants, Arthur M. Toms, Dori B. Schweitzer, James B. Toms, III, Andis, LLC, ATRC, LLC, Stanco Equipment Co., Inc. (d/b/a Stanco Recycling), and Sandor Enterprises, LLC (collectively "Defendants"), state as follows:

### INTRODUCTION

1.      This action arises from a multi-million dollar criminal enterprise and fraud in which Defendants converted Plaintiffs' materials and property from the Tanners Creek Plant demolition site located in Lawrenceburg, Indiana.

2.      The Defendants engaged in a criminal conspiracy and fraud to gain access to industrial demolition sites, including the Tanners Creek site, and thereafter converted valuable

scrap materials from those sites. Defendants transported the materials in interstate commerce to various scrap-metal recyclers, including, among others, Defendant Stanco Recycling, where the stolen scrap materials were liquidated. Defendants then pocketed their fraudulent and criminally derived proceeds, and funneled some of these ill-gotten gains back into their seemingly legitimate enterprises—Andis, LLC, ATRC, LLC, Stanco Recycling, and Sandor Enterprises—in furtherance and continuance of their scheme.

3.      Defendants secretly removed, transported, and sold more than $4 million of Plaintiffs' scrap materials without Plaintiffs' knowledge or consent and without compensating Plaintiffs for these sales.

4.      Defendants converted Plaintiffs' property in violation of Ind. Code § 34-43-4-1, which subjects them to liability under the Indiana Crime Victims Relief Act, Ind. Code § 34-34-3-1.

5.      Additionally, Defendants conduct amounts to common-law conversion, common-law fraud, common-law conspiracy, breach of fiduciary duty, breach of contract, negligence and negligent supervision, promissory estoppel, unjust enrichment, for which the Court should immediately impose a constructive trust for Plaintiffs' benefit and protection.

**THE PARTIES**

6.      Plaintiff Tanners Creek Development, LLC ("TCD") is a Missouri limited liability company with its principal place of business in St. Louis, Missouri. TCD's members are the Michael J. Roberts Revocable Living Trust and the Thomas E. Roberts Revocable Living Trust, the trustees of which are Michael J. Roberts and Thomas E. Roberts, respectively. Each of the trustees is domiciled in, and a citizen of, Missouri.

7.     Plaintiff EnviroAnalytics Group, LLC ("EAG"), is a Missouri limited liability company with its principal place of business in St. Louis, Missouri.  EAG's members are the Michael J. Roberts Revocable Living Trust, the Thomas E. Roberts Revocable Living Trust, the Melody A. Roberts Lifetime Marital Trust, and the Karin L. Roberts Lifetime Marital Trust, the trustees of which are Michael J. Roberts, Thomas E. Roberts, Melody A. Roberts, and Karin L. Roberts, respectively.  Each of the trustees is domiciled in, and a citizen of, Missouri.

8.     Plaintiff Industrial Demolition, LLC ("Industrial Demolition"), is a Missouri limited liability company with its principal place of business in St. Louis, Missouri.  Industrial Demolition's members are the Michael J. Roberts Revocable Living Trust and the Thomas E. Roberts Revocable Living Trust, the trustees of which are Michael J. Roberts and Thomas E. Roberts, respectively.  Each of the trustees is domiciled in, and a citizen of, Missouri.

9.     Plaintiff Commercial Development Co., Inc. ("CDC") is a Missouri corporation with its principal place of business in St. Louis, Missouri.

10.     Defendant Arthur M. Toms ("Artie Toms") is a natural person, domiciled in Columbia, Illinois.

11.     Defendant Dori B. Schweitzer ("Schweitzer") is a natural person, domiciled in Highland Heights, Kentucky.

12.     Defendant James B. Toms, III ("James Toms"), is a natural person, domiciled in Millstadt, Illinois.

13.     Defendant Andis, LLC ("Andis") is a Kentucky limited liability company with its principal place of business in Highland Heights, Kentucky.  Andis's sole member, Defendant Dori Schweitzer, is domiciled in Kentucky.

14.     Defendant ATRC, LLC, is a Missouri limited liability company with its principal place of business in Millstadt, Illinois.   ATRC's sole member, Defendant James Toms, is domiciled in Illinois.

15.     Defendant Stanco Equipment Co., Inc. ("Stanco" or "Stanco Recycling") is a Kentucky limited liability company with its principal place of business in Dry Ridge, Kentucky. Stanco's members, Defendant Schweitzer and Sandra K. Wyatt, are natural persons domiciled in Kentucky.

16.     Defendant Sandor Enterprises, LLC ("Sandor"), is a Kentucky limited liability company with its principal place of business in Dry Ridge, Kentucky. Sandor's members, Defendant Schweitzer and Sandra K. Wyatt, are natural persons domiciled in Kentucky.

## JURISDICTION AND VENUE

17.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the parties are diverse and the amount in controversy exceeds $75,000.

18.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this judicial district and because the Tanners Creek Development demolition site, from where the material and property was stolen, is located in Lawrenceburg, Indiana, which is in the Southern District of Indiana, New Albany Division.

## FACTS COMMON TO ALL CLAIMS

### The Plaintiff Entities

19.     Plaintiffs are a collection of related environmental-remediation and commercial-development firms that specialize in remediating environmentally impacted real estate, including, but not limited to, properties formerly used as power plants.

20.     Plaintiffs have demolished and remediated power-plant sites across the country, including in Chamois, Missouri; Lockbourne, Ohio; and, currently, Lawrenceburg, Indiana; Somerset, Massachusetts; and Marysville, Michigan.

21.     During the demolition and remediation process, Plaintiffs recycle all of the former facility's materials. At the Tanners Creek Plant site, for example, Plaintiffs will recycle 98 percent of the site's materials. This process is environmentally responsible and produces a revenue stream for Plaintiffs.

22.     Certain scrap materials, such as copper, cupronickel, brass, aluminum, and various grades of steel, are especially valuable and are found in large quantities in former power plants.

## American Electric Power's Tanners Creek Power Plant

23.     The Tanners Creek Plant was a coal-fired power-generating station located in Lawrenceburg, Indiana.  The Tanners Creek Plant opened in March of 1951 and ultimately was comprised of four generating units capable of generating approximately 1,000-megawatts of electricity.

24.     In 2013, the owner of the Tanners Creek Plant, American Electric Power ("AEP"), announced that it would shutter all four units at the Tanners Creek Plant.

25.     In October 2016, Plaintiff TCD acquired the Tanners Creek Plant, which included more than 700 acres of real property and all of the materials and equipment thereon.

26.     Plaintiffs bought the property for the purpose of demolition, environmental remediation, and redevelopment—in essence, Plaintiffs would remove the power plant, remediate any environmental issues, and prepare the property for a new, productive use, while saving and repurposing as many of the materials on site as possible.

27.     Indeed, Plaintiffs anticipated recycling 98 percent of the materials left behind by the demolition of the Tanners Creek Plant.

28.     Estimating the value of scrap material that will be recovered from an industrial demolition site is a difficult endeavor.  Although Plaintiffs make conservative estimates, it is only after demolition begins that the true value of scrap materials will reveal itself.

29.     For example, at the Tanners Creek Plant demolition site, Plaintiffs knew that the plant contained four units, made up of a total of seven turbines.  It was not known, however, what types of scrap material those turbines contained, let alone what amount of a particular material would be found in each turbine.

30.     Thus, owners of industrial-demolition sites, like Plaintiff TCD, must place trust in their contractors. Although Plaintiff TCD required the contractors at Tanners Creek Plant demolition site to relay details about each scrap truck that left the site—including identifying information about the truck, the driver, and the type and weight of material being hauled— Plaintiff TCD still had to trust that the contractor was not discovering scrap on the property and secretly selling it for its own gain.

31.     Work on demolition and remediation of the site began in early 2017.  Shortly thereafter, Defendants developed their scheme to steal millions of dollars' worth of scrap material from Plaintiff TCD, in breach of TCD's trust and in violation of state and federal law.

### The Andis Criminal Enterprise and Defendants' Schemes to Defraud

32.     Defendant Artie Toms has engaged in various business relationships with Plaintiffs over the years.

33.     Approximately 15 years' ago, Defendant Artie Toms began working for entities owned by Mike[1] and Tom Roberts, who also own the Plaintiff entities here.

34.     Specifically, Artie Toms worked as a heavy-equipment operator for Manchester 270 Development Company.  Artie Toms was employed in this role from December 20, 2002 until approximately June 2010.   As a heavy-equipment operator for Manchester 270 Development Company, Artie Toms worked primarily on excavation, rather than demolition, projects. From June 2010 until August 2018, Artie Toms worked as an independent contractor for entities owned by Mike and Tom Roberts.

35.     During this time, Artie Toms developed a personal friendship with Mike and Tom Roberts.

36.     Over time, Artie Toms began expressing interest in demolition work and he eventually formed his own company, Defendant ATRC, LLC. Artie Toms used his brother, James Toms, to form this company. Soon thereafter, Artie Toms began holding himself out as a contractor with knowledge and experience in the demolition-contracting industry.

37.     Artie Toms specifically sought work from Mike and Tom Roberts and their companies, leveraging the close personal relationship and trust built between himself and the Robertses over the years.

38.     After Plaintiffs purchased the Tanners Creek Plant site in 2016, Defendant Artie Toms—along with his and Defendant James Toms's company, ATRC, LLC—was hired to perform the demolition of 19 transformers located at the Tanners Creek Plant demolition site.

39.     Before or during this same time, approximately February 2017, Defendant Artie Toms met Defendant Dori B. Schweitzer, a resident of nearby Northern Kentucky.  Importantly,

---

[1] References hereinafter will refer to Michael "Mike" Roberts as "Mr. Roberts."

Defendant Schweitzer is the co-owner of Defendant Sandor Enterprises and its affiliate, Defendant Stanco Recycling.

40. Defendant Artie Toms and Defendant Schweitzer soon became romantically involved, and, thereafter, struck up a business relationship, too.

41. Defendant Stanco Recycling—which is controlled by Defendant Schweitzer and her related company, Defendant Sandor Enterprises—is in the business of recycling various scrap materials, including scrap materials like those expected to be recovered from the Tanners Creek Plant demolition site.

42. Defendant Stanco advertises itself as a great place to get cash for scrap, and even maintains a website titled "getcashforscrap.com." It does so despite the multitude of problems created by inviting individuals to exchange scrap materials for hard-to-trace cash.

43. Defendant Artie Toms, with his access to the vast scrap materials available at the Tanners Creek Plant demolition site, and Defendant Schweitzer, with her scrap-metal-recycling company, soon hatched the scheme that became Defendants' criminal enterprise.

44. Together, beginning in or about February 2017, Defendant Artie Toms and Defendant Schweitzer agreed to a criminal scheme to defraud Plaintiffs by stealing Plaintiff TCD's scrap material, selling it through Defendant Stanco and other scrap dealers, and then laundering and distributing the proceeds of that interstate theft to themselves and others, including, but not limited to, Defendant James Toms and other individuals who worked at the Tanners Creek Plant site.

45. Defendants Artie Toms and Schweitzer's scheme would further defraud Plaintiffs CDC and EAG via fraudulent orders for tools and equipment and by Defendants' false reporting regarding the time spent by ATRC (and, later, Andis) employees working for Plaintiffs.

46.     Artie Toms and his related companies eventually entered into an agreement with Plaintiffs pursuant to which Defendant Artie Toms would oversee the complete demolition of the Tanners Creek Plant site.

47.     Defendant Artie Toms touted that he and his companies could perform the work more efficiently than his competitors, and Plaintiffs, based on their past relationship with Defendant Artie Toms, agreed to permit Artie Toms to complete the entire demolition project at the Tanners Creek Plant, with the explicit understanding that all scrap material recovered from the Tanners Creek site was property of Plaintiff TCD and the revenue from any and all material sold from the site would to be returned to TCD.

48.     In agreeing to allow him to oversee demolition of the Tanners Creek Plant, Plaintiffs relied on, and trusted, Defendant Artie Toms.

49.     In exchange for his services, Defendant Artie Toms was paid $1,000 per day.

50.     Additionally, Plaintiffs CDC and EAG provided all the equipment and tools on the site, paid all bills, including fuel and repair bills, and also paid for the labor expended by Artie Toms's employees.

51.     Eventually, in January 2018, Defendants Artie Toms and Dori Schweitzer formed another front company to further their criminal enterprise.

52.     That company was called Artie and Dori Industrial Services—or "Andis" for short. Andis would ultimately provide industrial-demolition services not only at the Tanners Creek site, but at other demolition sites, including at the former Beckjord Power Plant in Clermont County, Ohio.

53.     Defendants Artie Toms, Dori Schweitzer, ATRC, and Andis represented to and promised Plaintiffs that they would demolish the plant and return all revenues from salvageable materials to Plaintiff TCD.

54.     Plaintiff TCD relied on Defendants Artie Toms's, Dori Schweitzer's, ATRC's and Andis's representations and promises regarding their return of all scrap proceeds to Plaintiff TCD in allowing these Defendants to demolish the site. Plaintiffs believed they could trust Defendant Artie Toms based on the longstanding business and personal relationship between Artie Toms and the owner of the Plaintiff entities, Mr. Roberts.

55.     Defendants Artie Toms, Dori Schweitzer, ATRC, and Andis made these promises with the expectation that Plaintiff TCD would rely on the promises.

56.     Defendants Artie Toms's, Dori Schweitzer's, ATRC's, and Andis's promise to return all scrap proceeds to Plaintiff TCD or to otherwise dispose of all material on the site only with Plaintiff TCD's knowledge and consent was definite and substantial in nature.

57.     Indeed, that the demolition contractor would return all scrap proceeds to Plaintiff TCD was, and would have been, integral to any agreement to demolish the Tanners Creek Plant site, especially since Plaintiffs paid all of Artie Toms's and his companies' expenses for demolishing the site.

58.     Moreover, that the parties knew that all scrap materials belonged to Plaintiff TCD, and that all proceeds from that scrap had to be returned to TCD, is evinced by Plaintiff TCD's security and loss-prevention measures at the site.

59.     Specifically, Plaintiff TCD utilized and maintained a scale house and scales, and it paid for a scale-house operator to monitor the scales during working hours. The scale-house operator was supposed to weigh every load of scrap or other material that left the site, record the

contents, weight, and identity of the truck and its driver, and report all of this information to Plaintiffs.

60. Additionally, Plaintiff TCD maintained a perimeter fence around the Tanners Creek Plant site and created a single point of entry, which required all trucks entering and leaving the site to pass by the scale house and scales.

61. These security measures, however, were circumvented by Defendant Artie Toms and his co-conspirators. Artie Toms's unfettered access to the site, which was gained through criminal conspiracy, breaches of trust, and misrepresentation, allowed Defendants to surreptitiously convert Plaintiff TCD's scrap materials, while avoiding the weighing and reporting requirements designed to prevent such theft.

62. Thus, although Defendants returned some of the proceeds from scrap materials to Plaintiffs, millions of dollars of proceeds and property were stolen from Plaintiffs by Defendants.

63. From February 2017 to August 2018, Defendants secretly removed, transported, and sold various scrap materials from the Tanners Creek Plant demolition site, including, *inter alia*, copper, cupronickel, aluminum, brass, stainless steel, steel, and iron, and other metals. Moreover, Defendants also stole, damaged, or otherwise rendered useless equipment that was purchased by Plaintiffs CDC and EAG for Defendants Artie Toms's, Dori Schweitzer's, ATRC's, and Andis's use on the site. These Defendants also converted former AEP equipment at the site, which Plaintiff TCD had purchased as part of its acquisition of the Tanners Creek Plant site.

64. During the relevant time, Defendants Artie Toms, James Toms, and Dori Schweitzer were at the Tanners Creek Plant demolition site after hours and on weekends.

65. During these after-hours visits, Defendants would load scrap material belonging to Plaintiff TCD onto trucks, including Stanco Recycling trucks, and then transport the material to scrap-metal recyclers in Illinois and Kentucky. The scrap materials loaded by Defendants had been prepared during the day by workers paid by Plaintiffs. Getting copper and brass prepared for market is an extensive process that requires significant time and expertise. As such, the use of employees paid by Plaintiffs to prepare and process the scrap stolen by Defendants further defrauded Plaintiffs.

66. During this period, ATRC employees, Andis employees, and others saw Defendants Artie Toms, Dori Schweitzer, and James Toms at the Tanners Creek Plant demolition site after hours and on the weekends.

67. These individuals also saw Stanco trucks at or near the Tanners Creek Plant demolition site. As Andis workers and others were leaving the site, they often observed Stanco trucks parked in a cul-de-sac adjacent to a Frisch's Big Boy restaurant, which is near the Tanners Creek Plant demolition site.

68. Stanco was not an approved vendor at the Tanners Creek Plant demolition site and should not have been on the site, nor should it have received any scrap from the site. In fact, Plaintiffs never did any business with Stanco and did not know the company existed until after this fraud was uncovered in August 2018.

69. These Stanco trucks were loaded with scrap material belonging to Plaintiff TCD. Plaintiff TCD's stolen scrap material was transported to Defendant Stanco's recycling facility in Dry Ridge, Kentucky and to a recycling facility in southern Illinois.

70. Defendants' scheme converted more than $4 million of Plaintiff TCD's scrap materials from the Tanners Creek Plant site.

71.     Per Defendant Schweitzer's statement to police and subsequent check production, it is clear that Defendant Stanco, alone, processed at least $1.2 million in scrap material stolen from Plaintiffs. That is the amount that Plaintiff TCD can confirm at this time. Further investigation will likely demonstrate that the total amount of stolen material processed by Defendant Stanco was far greater.

72.     Indeed, Defendant Dori Schweitzer told the Lawrenceburg Police that the Tanners Creek Plant site was a "gold mine" for her and Defendant Stanco. Again, because Stanco was not an approved scrap-material-recycling vendor, and because Defendants Schweitzer, Stanco, and Sandor were well-aware of that fact, it should not have processed any of Plaintiff TCD's materials.

73.     Plaintiffs did not receive any compensation from the scrap materials processed by Defendants Stanco or by the southern-Illinois-based scrap dealer.

74.     Regarding the Illinois-based scrap dealer, Plaintiff TCD did not authorize any scrap sales to this scrap recycler either.

75.     Defendant Artie Toms, however, told his employees that the owner of the Illinois-based scrap dealer was his and Mr. Roberts's friend and that the company was an approved scrap recycler. Neither is true, and both are further misrepresentations made by Defendant Artie Toms to promote his fraudulent scheme.

76.     By concealing and retaining the proceeds from the scrap sales, Defendants Artie Toms, Dori Schweitzer, ATRC, Andis, Sandor, and Stanco have received a measurable benefit from Plaintiff TCD. The sale of the scrap material generated substantial proceeds for Defendants for which Plaintiff TCD has not been compensated.

77.    Defendant Artie Toms told the Andis employees that his contract with Plaintiffs provided that Defendant Artie Toms and/or his companies owned all of the scrap materials at the Tanners Creek Plant demolition site. He did so despite the fact that Plaintiffs CDC and EAG paid for all labor, tools, and equipment on the site, in addition to paying Defendant Artie Toms, too.

78.    This representation is materially false. Plaintiff TCD owned all of the scrap materials at the site and Defendants were aware of this fact.

79.    Indeed, even Andis employees found Defendant Artie Toms's assertion that he owned all of the scrap "odd" because the Andis employees were told to call in and report to Plaintiffs every scrap truck that they loaded, including identifying the truck, the type of material on the truck, and the weight of said material.

80.    Additionally, scrap materials were approved to be sold to River Metals, Cohen Recycling, Southern Metals, and Cobra Metals—not Stanco or any other scrap dealer—creating confusion among the Andis employees regarding why the Stanco trucks were seen on or near the Tanners Creek Plant demolition site after hours and on the weekends.

81.    Some of Defendant ATRC's and Andis's employees also engaged in theft of Plaintiff TCD's scrap materials and Plaintiffs CDC's and EAG's equipment, and tools.  These thefts were enabled by Defendants Artie Toms's, Dori Schweitzer's, ATRC's, and Andis's negligent supervision of those employees.

82.    In fact, as discussed *infra*, some of the employees' thefts were explicitly authorized by Defendant Artie Toms, including the theft of pipe by an employee.

83.    In this way, ATRC's and Andis's employees acted to further those companies,' and their owners,' business interests by removing scrap material and retaining the proceeds either

for the employees' benefit, for Defendants Artie Toms's, Dori Schweitzer's, ATRC's, or Andis's benefit, or, occasionally, for the employees' and the Defendants' benefit.

84.     For example, Defendants sold stolen scrap materials, primarily salvaged heavy electrical equipment, to J.F. Electric, Inc., an electric contractor headquartered in Edwardsville, Illinois. Defendants split the proceeds from these illicit sales.

85.     Defendant Artie Toms also used a contact within J.F. Electric to improperly win contracting bids at sites across the country, wherein Defendant Artie Toms planned to continue his criminal enterprise. Specifically, the J.F. Electric employee would provide Defendant Artie Toms with inside information on competitors' bids, enabling him to undercut those bids.

86.     Defendant Artie Toms also made misrepresentations to Plaintiff TCD regarding the wiring found inside the Tanners Creek Plant. Defendant Artie Toms represented to Plaintiff TCD that most of the wiring found at the site was aluminum, rather than copper.

87.     This misrepresentation was materially false.   Plaintiff TCD subsequently discovered that most of the wire at the Tanners Creek Plant site was, in fact, copper wiring, which is approximately 75 percent more valuable than aluminum.

88.     Moreover, ATRC's and Andis's employees' authorized acts were closely associated with their unauthorized acts because the employees were at the Tanner's Creek Plant site specifically to demolish the plant, salvage the scrap, and return all scrap proceeds to Plaintiff TCD—in essence, their authorized acts differed only in failing to return the proceeds to Plaintiff TCD.  This failure was enabled, and encouraged, by Defendants Artie Toms, Dori Schweitzer, ATRC, and Andis.

89.     Defendant Artie Toms frequently employed his brother, Defendant James Toms, in this criminal enterprise and in his J.F. Electric scam.  Defendant ATRC was established in

Defendant James Toms's name and many of Defendant Artie Toms's assets are held by Defendant James Toms.

90.    Defendant Artie Toms has long used James Toms to gain access to credit and to hide assets. Artie Toms began doing so when he was going through a contested divorce.

91.    During a videotaped interview with the Lawrenceburg Police, Defendant Artie Toms admitted that his credit was poor and that he often used his brother James Toms to obtain credit for him.

92.    During this same interview Defendant Artie Toms also admitted to processing more than $600,000 of Plaintiff TCD's property, and, to cover his tracks, he lied to the Lawrenceburg Police by stating that the $600,000 of property was derived from material abandoned by NRI Industrial ("NRI"), a third-party company to which Plaintiff TCD sold some materials.

93.    NRI's owner confirmed, however, that the company left behind no more than a few hundred dollars' worth of material, and, in any event, NRI never agreed to give Artie Toms or his companies any of the material that NRI left behind. Moreover, NRI paid only $78,000 for all the material it purchased from Plaintiff TCD, rendering Defendant Artie Toms's explanation for the $600,000 in proceeds utterly implausible.

94.    Additionally, Defendants Artie Toms, Dori Schweitzer, ATRC and Andis ordered hundreds of thousands of dollars' worth of equipment and tools, ostensibly for use at the Tanners Creek Plant demolition site. These tools, however, repeatedly turned up "missing," requiring Defendants Artie Toms and Dori Schweitzer, by and through Defendants ATRC and Andis, to place new orders for tools. Defendant Artie Toms asked Plaintiffs CDC and EAG to reimburse him for the costs of the equipment and tools and Plaintiffs CDC and EAG did so, based on

Defendants Artie Toms's, Dori Schweitzer's, ATRC's, and Andis's false representations that the equipment and tools were going to be used for work at Tanners Creek Plant demolition site.

95.    In fact, however, Defendants Artie Toms, Dori Schweitzer, ATRC, and Andis were using the equipment and tools paid for by CDC and EAG to furnish work on other demolition projects not owned or affiliated with Plaintiffs, including at various sites where J.F. Electric was awarded contracts, as well as at the Beckjord Power Plant in Clermont County, Ohio.

96.    Moreover, Defendants Artie Toms, Dori Schweitzer, ATRC, and Andis negligently supervised ATRC's and Andis's employees while those employees were using equipment and tools belonging to or purchased by Plaintiffs.

97.    ATRC's and Andis's employees misused the equipment and tools resulting in damage and unnecessary wear and tear to those tools.

98.    Defendants Artie Toms, Dori Schweitzer, ATRC, and Andis failed to exercise sufficient oversight over these employees, enabling their damage and misuse of the $8 million of equipment and tools Plaintiffs provided for use at the Tanners Creek Plant site.

99.    The employees' acts were within their scope of employment with ATRC and Andis and were in furtherance of Defendants Artie Toms's, Dori Schweitzer's, ATRC's, and Andis's business interests.

100.    And Defendant Artie Toms admitted responsibility for his employees' various actions, stating that he was supervising the employees and was responsible for them. Defendant Artie Toms also said Defendant Andis shared responsibility as well.

101.    Defendants Artie Toms, Dori Schweitzer, ATRC, and Andis stole not only scrap, equipment, and tools from Plaintiffs, but also stole time and labor from them as well.

102.     Specifically, Defendants Artie Toms, Dori Schweitzer, ATRC, and Andis further defrauded Plaintiffs by falsely reporting that Defendants' employees were working at the Tanners Creek Plant site for Plaintiffs when those employees were actually processing and loading materials that would later be stolen by the Defendants.

103.     Defendants' scheme began to unravel in late July and early August of 2018.

104.     In early August, several of Plaintiffs' employees traveled to the Tanners Creek Plant demolition site.

105.     On arrival, Plaintiffs' employees observed that the demolition site was nowhere near the level of completion that Defendants Artie Toms, Dori Schweitzer, ATRC, and Andis had represented.

106.     Specifically, in March 2018, Defendant Artie Toms represented that the Tanners Creek Plant site was 90 percent demolished. Defendant Artie Toms even threw a celebratory dinner at the nearby Hollywood Casino to commemorate reaching 90 percent completion.  This lavish dinner was multi-course, open bar, and completely free for the 40-50 people who attended, none of whom were TCD, CDC, or EAG employees.

107.     Further, in August 2018, not long before Defendant Artie Toms's criminal enterprise was discovered, he rented a suite at a Cincinnati Reds baseball game and hosted more than 20 individuals in that suite, presumably using funds derived from his and his co-conspirators' theft. This event, like the party at the casino, was meant to misrepresent progress at the site by creating a false sense that the demolition was proceeding at or ahead of schedule.

108.     Despite Defendant Artie Toms's misrepresentations regarding the progress on the demolition project, when Plaintiffs' employees arrived at the Tanners Creek Plant site in August 2018, it was immediately apparent that the site was nowhere near 90 percent completion.

109.    Plaintiffs' employees also noted that there were little to no tools on the site and that much of the heavy equipment was in a state of disrepair, from improper use, neglect, improper maintenance, and outright recklessness.

110.    Plaintiffs provided Defendants Artie Toms, Dori Schweitzer, ATRC, and Andis with millions of dollars' worth of equipment for use at the Tanners Creek Plant site.  These Defendants, however, failed to exercise reasonable supervision over those individuals who were using Plaintiffs' equipment, which then resulted in the failure to exercise reasonable care in using and maintaining that equipment.

111.    Defendants' negligent supervision was the direct and proximate cause of the damage to Plaintiffs' equipment.

112.    Defendants' negligent supervision damaged Plaintiffs CDC and EAG by causing them to incur hundreds of thousands of dollars in equipment-repair costs, not to mention the hundreds of thousands of dollars in equipment-replacement costs.

113.    Moreover, Plaintiffs' employees noticed that several of the turbines on the site were still smoking from torch cutting as part of their demolition and inquired with Defendant Artie Toms about the materials that were recovered from the demolition of those turbines.

114.    Defendant Artie Toms stated that the turbines contained no copper.

115.    Demolition of subsequent turbines, however, later revealed hundreds of thousands of dollars' worth of copper in each remaining turbine, in addition to hundreds of thousands of dollars of brass.  Neither the brass nor the copper found in the turbines was disclosed to Plaintiffs, and Plaintiffs did not receive any proceeds from the sale of these materials.

116.    During this same time, Andis employees began to relay stories about the Stanco trucks and the after-hours removal of materials to Plaintiffs' employees.

117.    Moreover, Plaintiffs learned that one of Andis's employees was selling salvaged plastic pipe from site on the internet. When the employee was later confronted about why he was illegally selling Plaintiffs' property, he stated that Defendant Artie Toms authorized him to do so, and that the two had agreed to split the funds from the sale.

118.    Other ATRC and Andis employees at the site indicated that they, too, heard Defendant Artie Toms tell the employee to sell the pipe.

119.    In an email to Mr. Roberts and the Plaintiff entities, and in a videotaped interview with the Lawrenceburg Police, Defendant Artie Toms denied ever telling the employee to sell the pipe. Defendant Artie Toms's denial is false, and is refuted by various employees reporting that Artie Toms told the employee not only to sell the pipe, but also ordered the employee to then split the proceeds of the sale with him.

120.    Plaintiffs further learned that Defendant Artie Toms was selling other materials from the Tanners Creek site, including a large $CO_2$ tank, which Artie Toms sold to a local company for $4,000 in cash, and electrical components and parts, which he sold to J.F. Electric., among others.

121.    When confronted about this unauthorized sale, which Plaintiff TCD knew nothing about and for which it received no compensation, Defendant Artie Toms falsely stated that he told one of his employees to remit payment to the Plaintiff companies.

122.    Plaintiffs fired Defendant Artie Toms, and by extension Defendants Dori Schweitzer, ATRC, and Andis, in early August 2018, due to their negligence in overseeing the demolition and due to concerns about the overall state of the site.

123.    Despite firing Defendants Artie Toms, Dori Schweitzer, ATRC, and Andis from the site, Plaintiffs retained the trustworthy and competent ATRC and Andis employees at the site.  Many of those individuals remain employed by Plaintiffs or affiliated entities.

124.    Plaintiffs later learned that the theft of property from the site was not confined to the aforementioned pipe or $CO_2$ tank.  Instead, once they examined the site and spoke with individuals on the site, including former ATRC and Andis employees, Plaintiffs determined that Defendants had engaged in a large-scale, systematic, interstate fraud to convert valuable scrap materials on the property and to otherwise defraud Plaintiffs by placing fraudulent orders for tools and equipment.

125.    During an videotaped interview with the Lawrenceburg Police Department, Defendant Artie Toms admitted that he had sold approximately $600,000 worth of scrap material for his own benefit, but he claimed that this was scrap material left behind by another company, NRI Industrial Sales, LLC ("NRI"), which had purchased materials, from Plaintiff TCD, located in certain warehouses and control rooms near the site.

126.    NRI paid a total of $78,000 for these materials.

127.    The owner of that company, Steven Stipanovich, stated that his company left, perhaps, $200 in scrap material behind at the site.

128.    Defendant Artie Toms's statement that the $600,000 in scrap material he sold came from NRI's abandoned property is another falsehood designed to cover up Defendant's multi-million dollar fraud.

### Plaintiff TCD's Damages from Defendants' Scheme

129.    As noted above, owners of industrial demolition sites must place trust in their demolition contractors due to the unknown quantities of scrap material that a site will generate.

130.    Here, Plaintiff TCD anticipated that each of the four units at the Tanners Creek Plant had condenser tubes, made from valuable cupronickel.  It turned out, however, that each of the turbines also had substantial amounts of copper, brass, and steel.  That the turbines contained a large amount of copper, brass, and steel was discovered only after the turbines were dissected and demolished.  In fact, the turbines each contained solid copper shafts, weighing hundreds of thousands of pounds, and each was worth hundreds of thousands of dollars.

131.    Plaintiff TCD did not receive the proceeds from this copper, however, because Defendants Artie Toms, Dori Schweitzer, James Toms, ATRC, and Andis concealed the discovery of these scrap materials from Plaintiff TCD.

132.    Additionally, Plaintiff TCD later learned that the turbines also contained significant amount of brass, another valuable scrap material.

133.    Plaintiff TCD's records, however, show very little to no proceeds from the sale of brass, despite reports from former Andis employees that huge amounts of brass were recovered from the turbines.

134.    Fortunately, Defendants' scheme was uncovered before they finished demolition of the last two turbines.

135.    Plaintiff Industrial Demolition is now in charge of the Tanners Creek Plant demolition and project, and, as it has demolished the remaining turbines, the extent of Defendants' fraud has become painfully apparent.

136.    Similarly, Defendant Artie Toms told Plaintiff TCD that most of the wiring recovered from the site was aluminum, not copper.  Plaintiff TCD has subsequently learned that nearly all of the wire on the site was copper wire.  Plaintiff TCD received little to no proceeds

from the sale of copper wire, which, as mentioned *supra*, is significantly more valuable than aluminum.

137.   Although Plaintiff TCD is aware of approximately $1.2 million of stolen material processed by Defendant Stanco, the true extent of the fraud will not be known until after discovery

138.   Plaintiff TCD estimates that Defendants converted more than $4 million of its scrap material.

### Plaintiffs EAG's and CDC's Damages from Defendant's Scheme

139.   Defendants ordered tools and equipment allegedly for use at TCD. Upon information or belief, some of the tools and equipment were not used at TCD and others were removed from the site when Plaintiffs fired Defendant Artie Toms.

140.   Further, Defendants falsely reported that ATRC and Andis employees were working for Plaintiffs CDC and EAG when, in fact, those employees were often unwittingly aiding Defendants in their theft of Plaintiffs' property.

141.   Additionally, Defendants, due to their negligent supervision of others, caused Plaintiffs' equipment on the site to be damaged due to, *inter alia*, misuse, neglect, improper maintenance, and general recklessness.

### COUNT I – CVRA (AGAINST ALL DEFENDANTS)

142.   Plaintiffs incorporate Paragraphs 1–141 as if fully restated herein.

143.   Pursuant to the CVRA, Ind. Code § 34-4-30-1, Indiana law provides a civil remedy for victims of certain criminal conduct, including for victims of criminal conversion, codified at Ind. Code § 35-43-4-3.

144. A defendant criminally converts property when he knowingly or intentionally exerts unauthorized control over property of another person.

145. All materials on the Tanners Creek Plant demolition site belonged to Plaintiff TCD, including all scrap materials on the site. As the owner of the site and the scrap materials thereon, Plaintiff TCD had an immediate and unqualified right to possession that rested on a superior claim of title.

146. By removing and selling scrap materials belonging to Plaintiff TCD to, *inter alia*, co-conspirator Stanco, Defendants knowingly and intentionally exercised unauthorized control over another's property.

147. Defendants not only exercised unauthorized control over Plaintiff TCD's scrap materials by removing and selling its scrap materials, but Defendants then kept the proceeds derived from those illegal sales, which is a separate act of conversion with specifically identifiable proceeds.

148. Defendants also exercised unauthorized control over Plaintiffs' property by removing and utilizing equipment and tools from the Tanners Creek Plant demolition site at other demolition sites without Plaintiffs' knowledge or consent. These separate instances of unauthorized use of Plaintiffs' property amount to separate and distinct acts of conversion.

149. Due to Defendants criminal enterprise and their conversion, Plaintiffs have been damaged by lost proceeds from scrap sales and by the conversion of equipment and tools purchased for work on Plaintiffs' site, but which Defendants removed to unauthorized and unrelated work sites.

150. Plaintiffs have been additionally damaged by Defendants' false reporting of their employees' time.

151.   Plaintiffs are entitled to relief under the CVRA for the Defendants' violation of Ind. Code § 34-43-4-3, including actual damages, treble damages, costs, reasonable attorneys' fees, and any other relief the Court deems just and proper.

### COUNT II – COMMON-LAW CONVERSION (AGAINST ALL DEFENDANTS)

152.   Plaintiffs incorporate Paragraphs 1–151 as if fully restated herein.

153.   Defendants, by selling scrap materials belonging to Plaintiffs, appropriated Plaintiff TCD's personal property for their own use or benefit, exercised dominion over the property, in exclusion and defiance of Plaintiff TCD's rights, under a claim and title inconsistent with Plaintiff TCD's rightful title to the scrap materials.

154.   Moreover, Defendants, by using equipment and tools purchased by and belonging to Plaintiffs for unauthorized work on unrelated work sites, further appropriated Plaintiffs' personal property for his own use or benefit, exercised dominion over the property, in exclusion and defiance of Plaintiffs' rights, under a claim and title inconsistent with Plaintiffs' rightful title to the equipment and tools.

155.   This conversion is wholly inconsistent with the parties' agreement, which provided that Defendants' would be completely compensated for their labor and all expenses, but that all scrap material, and any proceeds derived therefrom, belonged to Plaintiff TCD.

156.   Defendants' unauthorized appropriation and use of Plaintiffs' property amounts to common-law conversion of that property.

157.   Defendants' common-law conversion of Plaintiffs' property damaged Plaintiffs by depriving them of the value and the proceeds from the scrap materials that Defendants removed from the site. Plaintiffs were further damaged by Defendants' removal and

appropriation of equipment and tools from the Tanners Creek Plant demolition site and by Defendants' false reporting of their employees' time.

## COUNT III – COMMON-LAW FRAUD
### (AGAINST DEFENDANTS ARTIE TOMS, SCHWEITZER, ATRC AND ANDIS)

158.    Plaintiffs incorporate Paragraphs 1–157 as if fully restated herein.

159.    Defendants Artie Toms, Schweitzer, ATRC and Andis represented to Plaintiffs that all scrap material salvaged from the Tanners Creek demolition site was sold for Plaintiff TCD's benefit and that Plaintiff TCD was receiving all proceeds from the sale of its scrap materials.

160.    In fact, these representations were material and false because Defendants Artie Toms, Schweitzer, ATRC, and Andis were removing, selling, and retaining the proceeds from the sale of scrap material belonging to Plaintiff TCD.

161.    Further, Defendants Artie Toms, Schweitzer, ATRC, and Andis requested that Plaintiffs purchase certain equipment and tools for use at the Tanners Creek Plant demolition site, and stated that that equipment and those tools were for use at the Tanners Creek Plant demolition site.

162.    In fact, however, Defendants Artie Toms, Schweitzer, ATRC, and Andis purchased that equipment and those tools for use on other demolition sites not owned by or affiliated with Plaintiffs.

163.    Moreover, Defendant Artie Toms stated in March 2018 that the demolition of the Tanners Creek Plant was more than 90 percent complete.

164.    But the Tanners Creek Plant was not, and is still not, 90 percent complete.

165.    Defendants Artie Toms, Schweitzer, ATRC, and Andis knew, or were reckless in not knowing, that these statements to Plaintiffs were false.

166.   Plaintiffs relied on Defendants Artie Toms's, Schweitzer's, ATRC's, and Andis's misrepresentations and their concealing effect allowed these Defendants to continue stealing Plaintiffs' property.

167.   Moreover, Defendants Artie Toms's, Schweitzer's, ATRC's, and Andis's misrepresentations regarding the equipment and tools caused Plaintiffs to pay for equipment and tools not needed for the Tanners Creek Plant demolition site and for equipment and tools that were, instead, being used by Defendants on other work sites not owned by or affiliated with Plaintiffs.

168.   Plaintiffs relied on Defendant Artie Toms' misrepresentations regarding the progress on the demolition of the Tanners Creek Plant, and, in their reliance, assumed that progress on the demolition was proceeding as Defendant Artie Toms claimed.

169.   Defendants Artie Toms's, Schweitzer's, ATRC's, and Andis's material misrepresentations proximately caused Plaintiffs to be damaged and injured by, *inter alia*, the lost proceeds from the scrap material stolen from the Tanners Creek Plant, by false orders for equipment and tools, by false reports of time worked by Defendants' employees, and by the false statement regarding the Tanners Creek Plant's demolition status, which misled Plaintiffs about the state of work at the site and has created remediation costs for Plaintiffs related to the delays in work created and concealed by these Defendants.

### COUNT IV – BREACH OF FIDUCIARY DUTY (AGAINST ARTIE TOMS)

170.   Plaintiffs incorporate Paragraphs 1–169 as if fully restated herein.

171.   Defendant Artie Toms entered into a contract with Plaintiffs to demolish the Tanners Creek Plant.  During the course of this demolition, it was agreed and understood that

Defendant Artie Toms would salvage all salvageable materials, including scrap materials, and would sell those materials and return the proceeds to Plaintiffs.

172.     Pursuant to this agreement, Defendant Artie Toms was acting on behalf of Plaintiffs as their agent. Specifically, Plaintiffs consented to Defendant Artie Toms acting as their agent, Defendant Artie Toms accepted this authority, and Plaintiffs did exert control over Defendant Artie Toms by requiring him to sell scrap materials and to return those proceeds to Plaintiffs. In fact, Defendant Artie Toms and his employees, with ATRC and with Andis, were required to immediately relay all sales of scrap to Plaintiffs.

173.     Plaintiffs thus entrusted Defendant Artie Toms to manage the work site and to ensure that their property was protected.  Specifically, Plaintiffs entrusted Defendant Artie Toms with the removal and sale of all scrap materials for Plaintiffs' benefit.

174.     Pursuant to this relationship, Defendant Artie Toms owed a duty to Plaintiffs to act in good faith, with due care, and with loyalty.  Defendant Artie Toms, however, failed to act solely for Plaintiffs' benefit and, instead, interfered with the purpose of the parties' relationship by stealing scrap material from Plaintiffs and by not returning the proceeds from the scrap sales to Plaintiffs.

175.     Because of Defendant Artie Toms's theft of scrap material, Plaintiffs did not receive the proceeds from the sale of the scrap materials and were thereby damaged by his conduct.

### COUNT V – COMMON-LAW CONSPIRACY (AGAINST ALL DEFENDANTS)

176.     Plaintiffs incorporate Paragraphs 1–175 as if fully restated herein.

177.   Defendants Artie Toms, Dori Schweitzer, James Toms, ATRC, Stanco, Sandor, and others conspired together, and, by concerted action, defrauded Plaintiffs and converted Plaintiffs' property for their own benefit.

178.   In so agreeing or combining, Defendants Artie Toms, Dori Schweitzer, James Toms, ATRC, Stanco, Sandor, and others sought to convert Plaintiffs property, which is an unlawful purpose, and did so by misrepresenting, concealing, and otherwise defrauding Plaintiff, which are unlawful means.

179.   Defendants Artie Toms, Dori Schweitzer, James Toms, ATRC, Stanco, Sandor, and others conspiring together to convert Plaintiffs' property deprived Plaintiffs of the proceeds received from the sale of Plaintiffs' property, thereby damaging Plaintiffs.

## COUNT VI – NEGLIGENT SUPERVISION
### (AGAINST ARTIE TOMS, SCHWEITZER, ATRC, AND ANDIS)

180.   Plaintiffs incorporate Paragraphs 1–179 as if fully restated herein.

181.   Defendant Artie Toms was a part owner and the manager of Defendants ATRC and Andis.  He was also the person in charge of the demolition of the Tanners Creek Plant site, and has admitted that he and his company, Andis, were responsible for his employees' actions on the site. Defendant Dori Schweitzer was a part owner and manager of Defendant Andis.

182.   Defendants Artie Toms, Dori Schweitzer, ATRC, Andis, and their respective employees owed Plaintiffs a duty to reasonably perform the demolition.

183.   But Defendants' employees' engaged in various intentional, reckless, or negligent conduct that breached duties owed to Plaintiffs and that has harmed Plaintiffs.

184.   Under Defendants' supervision, various employees engaged in conduct that harmed Plaintiffs TCD, CDC, and EAG.

185.   Specifically, Plaintiff TCD was harmed by ATRC and Andis employees who converted TCD's property.   These acts were within the scope of the ATRC and Andis employees' employment, furthered Defendant Artie Toms's business and Defendant Dori Schweitzer's business, and/or were unauthorized acts so closely related to the employees' authorized acts that they are within the scope of employment.

186.   At least some of the employees' conversion was explicitly authorized by Defendants Artie Toms, Dori Schweitzer, ATRC, and Andis.

187.   The conversion of Plaintiff TCD's property has harmed TCD by depriving it of the value of the scrap material taken from the site.

188.   Moreover, these Defendants were negligent in their supervision of their employees' work on the site and, rather than safeguarding Plaintiffs' equipment and tools to ensure that Plaintiffs' property was properly used and maintained, Defendants spent their time converting Plaintiff TCD's scrap materials. This lack of supervision resulted in the abuse, misuse, and theft of Plaintiffs CDC's and EAG's equipment and tools.

189.   Plaintiffs CDC and EAG had to replace and repair these tools and the expenses they incurred have damaged them.

190.   Defendants Artie Toms, Dori Schweitzer, ATRC, and Andis, as well as their employees and agents, owed Plaintiffs CDC and EAG a duty to reasonably use and maintain the millions of dollars' worth of equipment that CDC and EAG provided to Defendants for use at the Tanners Creek Plant site.

191.   Defendants Artie Toms, Dori Schweitzer, ATRC, and Andis breached this duty by failing to adequately and reasonably supervise their employees and agents while those employees and agents were operating and maintaining Plaintiffs CDC's and EAG's equipment.

192.    Plaintiffs CDC and EAG were damaged due to Defendants Artie Toms's, Dori Schweitzer's, ATRC's, and Andis's failure to adequately and reasonably supervise their employees and other agents while they were using Plaintiffs' equipment. This lack of supervision led to Plaintiffs CDC's and EAG's equipment being misused, improperly maintained, and generally abused by Defendants and their agents.

193.    Due to Defendants' negligent supervision, Plaintiffs CDC and EAG have incurred hundreds of thousands of dollars' worth of equipment-repair costs, as well as hundreds of thousands of dollars' worth of equipment-replacement costs.

194.    Further, this lack of supervision resulted in negligent performance of the demolition project.  This performance has resulted in remediation, cleanup, and delay costs for Plaintiff CDC. These costs have further damaged Plaintiff TCD.

## COUNT VII – PROMISSORY ESTOPPEL
## (AGAINST ARTIE TOMS, ATRC, AND ANDIS)

195.    Plaintiffs incorporate Paragraphs 1–194 as if fully restated herein.

196.    Defendant Artie Toms promised Plaintiff TCD that all scrap materials recovered from the site would be sold for TCD's benefit and that all proceeds from scrap sales would be returned to Plaintiff TCD. Defendant Artie Toms was a part owner and the manager of Defendants ATRC and Andis.

197.    Defendant Artie Toms made this promise with the expectation that Plaintiff TCD would rely on that promise.  In fact, that promise was integral to Plaintiff TCD's decision to allow Defendant Artie Toms to complete the demolition of the Tanners Creek Plant site.

198.    Plaintiff TCD relied on Defendant Artie Toms's promise.

199.   Defendant Artie Toms's promise that all scrap material would be removed for Plaintiff TCD's benefit and that all proceeds would be returned to TCD was definite and substantial.

200.   Injustice can be avoided only if this Court enforces Artie Toms's promise to sell all scrap material for Plaintiff TCD's benefit and enforces his promise to return all scrap proceeds to Plaintiff TCD.

## COUNT VIII – UNJUST ENRICHMENT (ALL DEFENDANTS)

201.   Plaintiffs incorporate Paragraphs 1–200 as if fully restated herein.

202.   By selling or receiving Plaintiff TCD's scrap material, retaining the proceeds therefrom, and then failing to remit those proceeds to Plaintiff TCD, Defendants have received a benefit and have had benefits conferred on them.

203.   Plaintiff TCD has not received compensation for the benefits conferred on Defendants.

204.   It would be manifestly unjust for Defendants to retain the proceeds of these crime and other unconscionable acts, which are derived from broken promises, fraud, breach of trust, and deceit.

205.   Accordingly, Plaintiff TCD asks this Court to find that Defendants have been unjustly enriched by their retention of proceeds or property derived from the proceeds of Plaintiff's TCD's scrap materials and that Defendants must pay restitution to Plaintiff TCD in the amount of this unjust enrichment.

## COUNT IX – CONSTRUCTIVE TRUST (ALL DEFENDANTS)

206.   Plaintiffs incorporate Paragraphs 1–205 as if fully restated herein.

207.    To prevent Defendants from being unjustly enriched, Plaintiff TCD asks the Court to impose a constructive trust in its favor.

208.    Defendants hold title to property belonging to Plaintiff TCD—namely the proceeds from TCD's scrap material and other scrap material that Defendants may have taken but has not yet sold.

209.    Defendants would be unjustly enriched if they are permitted to retain the proceeds or other property derived from their theft, conversion, and fraudulent obtainment of Plaintiff TCD's property.

210.    Accordingly, Plaintiff TCD requests that the Court find that Defendants' property, personal and real, is in a constructive trust for Plaintiff TCD's benefit and that the amount of the trust is up to the amount needed to compensate TCD for Defendants' fraud and other unconscionable conduct.

211.    Further, Plaintiff TCD requests that Defendants be ordered to convey property, personal and real, to Plaintiff TCD to prevent Defendants' unjust enrichment should they be permitted to retain the fruits of their fraudulent conduct.

## COUNT X – BREACH OF CONTRACT (AGAINST ANDIS AND ATRC)

212.    Plaintiffs incorporate Paragraphs 1–211 as if fully restated herein.

213.    On March 1, 2018, Plaintiff EAG entered into contracts with Andis and ATRC regarding the demolition at the Tanners Creek site.

214.    Andis and ATRC breached those contracts.

215.    Plaintiff EAG has been damaged by the breach.

**WHEREFORE**, Plaintiffs pray for the following relief:

(a)     Entry of Temporary Restraining Order and Preliminary Injunction freezing identified assets of the Defendants;

(b)     Entry of an order placing those assets in a constructive trust to protect Plaintiffs' property or proceeds derived from their property, pending resolution of this litigation;

(c)     A trial by jury;

(d)     A declaration that the contracts between EAG and Andis and ATRC have been breached;

(e)     An award of compensatory damages;

(f)     An award of punitive damages;

(g)     An award of treble damages under the CVRA;

(h)     An award of costs, including reasonable attorneys' fees; and

(i)     Any other relief to which Plaintiffs are now or may hereafter appear entitled.

Respectfully submitted,

Caroline L. Pieroni (No. 34734-31; Admitted in S.D. Indiana)
Dinsmore & Shohl LLP
101 South Fifth Street, Suite 2500
Louisville, KY 40202
(502) 540-2300
kenyon.meyer@dinsmore.com
caroline.pieroni@dinsmore.com

and

G. Luke Burton (*pro hac vice* pending)
Dinsmore & Shohl LLP
255 E. Fifth Street, Suite 1900
Cincinnati, OH 45202
(513) 977-8200
luke.burton@dinsmore.com

*Counsel for Plaintiffs*

## VERIFICATION OF COMPLAINT

STATE OF MISSOURI                    )

COUNTY OF ST. LOUIS                  )

I, _MICHAEL J Roberts_, being duly cautioned and sworn, state that I am the _Manager_ for Plaintiffs _____,

and, as such, am authorized to act as an agent of Plaintiffs for the purpose of verifying the

Complaint herein in accordance with the Federal Rules of Civil Procedure.  To the extent I have

personal knowledge of the matters alleged in the Complaint, the information is true and accurate

to the best of my knowledge and belief.  Regarding any matters for which I do not have personal

knowledge, I am authorized by Plaintiffs to state that Plaintiffs are informed and believe that the

allegations of the Complaint are true and accurate to the best of their knowledge and belief.

_____
Michael J. Roberts

Subscribed and sworn by _Rebecca Lydon_ before me, a Notary Public, on this _14_ day

of November, 2018.

REBECCA LYDON
My Commission Expires
November 1, 2021
St. Louis County
Commission #13540330

_____
Notary Public

14154623v6

36